## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | § | |
| IN RE: | § | CASE NO: 19-12337 |
| | § | |
| ROYAL ALICE PROPERTIES, LLC, | § | CHAPTER 11 |
| | § | |
| DEBTOR. | § | SECTION A |
| | § | |

## MEMORANDUM OPINION AND ORDER

This Court held a video evidentiary hearing on June 10–12, 2020, and June 25, 2020 (the "Hearing), to resolve **(1)** *United States Trustee's Motion To Convert Case to Chapter 7 or, in the Alternative, Appoint a Chapter 11 Trustee* ("Motion To Convert), [ECF Docs. 136 & 201], and responses filed by the Debtor, [ECF Docs. 170 & 181]; **(2)** *Motion of Party in Interest Arrowhead Capital Finance, Ltd. for Appointment of a Trustee for Debtor's Estate* ("Arrowhead Ch. 11 Trustee Motion"), [ECF Doc. 142], and the response filed by the Debtor, [ECF Doc. 157]; **(3)** the Debtor's *Motion for Entry of Order Authorizing Debtor To Obtain Postpetition Financing* (the "DIP Motion"), [ECF Doc. 143], and responses filed by Arrowhead Capital Finance, Ltd., [ECF Doc. 161], AMAG, Inc., [ECF Doc. 166], and the United States Trustee, [ECF Doc. 173]; **(4)** the adequacy of the Debtor's *Disclosure Statement for Amended Plan Dated April 15, 2020* (the "Amended Disclosure Statement"), [ECF Doc. 147], and responses filed by Arrowhead Capital Finance, Ltd., [ECF Doc. 159], AMAG, Inc., [ECF Doc. 165], and the United States Trustee, [ECF Doc. 172]; **(5)** the Debtor's *Application Authorizing Employment of Scott Graf and Corporate Realty Leasing Company, Inc. as Real Estate Broker* (the "Broker Emp't App."), [ECF Doc. 140], and the response filed by AMAG, Inc., [ECF Doc. 167]; and **(6)** the Debtor's *Motion for Entry of an Order Deeming Debtor's Amended Petition Designating Itself as a Subchapter V Small Business Debtor Choosing To Proceed Under Subchapter V of Chapter 11 as Correct or,*

*Alternatively, Dismissing Case for Purposes of Refiling Under Subchapter V* (the "Subchapter V Motion"), [ECF Doc. 192], and responses filed by Arrowhead Capital Finance, Ltd., [ECF Doc. 199], AMAG, Inc., [ECF Doc. 203], and the United States Trustee, [ECF Doc. 205].

After the completion of the evidentiary hearing, this Court took the matter under advisement and allowed post-trial briefing from the parties. Arrowhead Capital Finance, Ltd. ("Arrowhead"), the United States Trustee ("UST"), and AMAG, Inc. ("AMAG") each filed post-trial briefs. [ECF Docs. 270, 272 & 273]. The Debtor filed an omnibus post-trial brief in response. [ECF Doc. 293].

Based upon the pleadings, the record, the arguments of counsel, and the testimony and documentary evidence presented at the evidentiary hearing, after due deliberation, and for the reasons that follow,[1] this Court

1. GRANTS IN PART and DENIES IN PART the Motion To Convert, and orders the United States Trustee to appoint a chapter 11 trustee in this case;

2. GRANTS the Arrowhead Ch. 11 Trustee Motion;

3. DENIES WITHOUT PREJUDICE the DIP Motion;

4. DISAPPROVES WITHOUT PREJUDICE the Amended Disclosure Statement;

5. DENIES WITHOUT PREJUDICE the Broker Emp't App.; and

6. DENIES WITHOUT PREJUDICE the Subchapter V Motion.

---

[1] These findings of fact and conclusions of law constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed as findings of fact.

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334 and the Order of Reference of the District Court dated April 11, 1990. The matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b). The venue of the Debtor's chapter 11 case is proper under 28 U.S.C. §§ 1408 and 1409(a).

## NOTICE

Notice of all of the motions before the Court considered here was sufficient and constituted the best notice practicable. All persons affected by this Memorandum Opinion and Order were afforded a full and fair opportunity to be heard prior to and during the evidentiary hearing. Notice of the relief granted herein has been given to all persons affected by this decision and is in full compliance with due process.

## FINDINGS OF FACT

This Court held an evidentiary hearing on the UST's Motion To Convert, the Arrowhead Ch. 11 Trustee Motion, the Debtor's Disclosure Statement and related motions over the course of June 10–12 and June 25, 2020. During the multi-day hearing, the Court heard testimony from one of the UST's bankruptcy auditors; the Debtor's outside accountant; Susan Hoffman, the single member/manager of the Debtor, and her husband, Peter Hoffman, an authorized representative" of the Debtor "to deal with all matters related to the financing of the properties in this proceeding," *see* UST Ex. 16, at 2, and the Debtor's proposed real estate broker. The Court also considered the arguments and exhibits provided by the parties. At the close of the hearing, the Court took the matter under advisement to consider the full record in deciding the motions before it, including the post-trial briefs filed thereafter by the UST, Arrowhead, AMAG, and the Debtor.

## A.  The Debtor's Business Model

The Debtor, Royal Alice Properties, LLC, is a single-member limited liability company, organized under the laws of Louisiana in November 2011.  *See* UST Ex. 16, at 13 & 18 (transcript of § 341 meeting).  Susan Hoffman is the sole member and manager of the Debtor, *see* Hr'g Tr. 301:24–302:3 (June 12, 2020), although her husband, Peter Hoffman, testified that Susan Hoffman orally "appointed" him "as the special representative to assist Mrs. Hoffman with the proceedings under chapter 11," *see* Hr'g Tr. 133:3–11 (June 11, 2020).[2]  The Debtor's only assets consist of three real estate properties in the French Quarter neighborhood in New Orleans, Louisiana:  (a) 900–902 Royal Street; (b) 906 Royal Street, Unit E; and (c) 910–912 Royal Street, Unit C.  [ECF Doc. 2].  All three properties secure repayment of an obligation owed to AMAG.  [ECF Doc. 3].  The Debtor's income derives solely from leasing its three properties.

### 1.   The lease of 900-902 Royal Street

The four-story building located at 900-902 Royal Street is leased to two tenants.  The first floor of that building is leased to Royal Street Bistro, LLC ("RSB") for the operation of the *Petite Amelie* restaurant.  *See* Hr'g Tr. 305:14–15 (June 12, 2020); AMAG Ex. 19.  The twenty-year lease is dated August 29, 2019, the date of the Debtor's bankruptcy filing, and states that it is "an amendment and restatement of the Lease of the Premises entered into between Susan Hoffman and [RSB] dated as of January 18, 2018, to reflect the contribution of the Premises to [Royal Alice Properties, LLC] on or before August 28, 2019."  AMAG Ex. 19.  Pursuant to that lease, RSB is required to pay $5,000 per month in rent, plus all taxes, utilities, and insurance for that property. *See id*.  RSB is owned by the Katrin and Cassia Hoffman Trust (the "Trust"), a California trust

---

[2]       Peter Hoffman testified that although Susan Hoffman and he are married and legally separated, she remains his "oldest and closest friend in this world."  Hr'g Tr. 133:15–16; 266:8–10 (June 11, 2020).

established for the benefit of Peter Hoffman's children. *See* Amended Disclosure Statement, at 9. Although the Trust owns RSB, the Trust does not receive income from the operation of *Petite Amelie* or the Trust's other restaurant, *Café Amelie* (discussed below); instead, the income generated from the operation of those restaurants is paid directly to Susan Hoffman and is reported on the joint income tax return of Peter and Susan Hoffman. *See* Hr'g Tr. 187:18–190:4 (June 11, 2020).[3]

The second, third, and fourth floors of 900-902 Royal Street are leased to PicturePro LLC ("PicturePro"), a Colorado limited liability company with its principal place of business in Los Angeles, of which Peter Hoffman is a member and manager. *See* UST Ex. 16, at 28–29; AMAG Ex. 17. Two leases were admitted as evidence at the evidentiary hearing: (i) a twenty-year lease between Susan Hoffman and PicturePro, dated January 1, 2018, and recorded in the Orleans Parish land records, pursuant to which PicturePro is required to pay $10,000 per month in rent plus taxes and utilities; and (ii) an amended and restated lease between Royal Alice Properties, LLC, and PicturePro, dated "as of August 29, 2019," the date the Debtor filed for bankruptcy protection, pursuant to which PicturePro is required to pay $10,000 per month in rent—but not taxes and utilities. *See* AMAG Exs. 16 & 17.

Peter Hoffman testified that he acquired the building at 900-902 Royal Street in 1991 "as a gift for Susan, later reflected in a donation, an inter vivos donation," and that "[w]hen we bought it, it was intended to be a residence and also a first floor commercial space." Hr'g Tr. 505:16–20 (June 25, 2020). Indeed, Susan Hoffman continues to use the three upper floors of 900-902 Royal Street as her personal residence after donating the property to Royal Alice Properties, LLC, on the

---

[3]     Peter Hoffman testified that the co-manager of those restaurants and certain employees also receive profit-sharing bonuses from the restaurants' income. *See* Hr'g Tr. 187:18–190:4 (June 11, 2020).

eve of the bankruptcy filing, *see* Hr'g Tr. 305:7–20; 309:9–21, but the record does not show that she has a written lease with the Debtor or pays rent herself.   Susan Hoffman testified that Peter Hoffman had a home office on one of the upper floors of the building, but that his use of the premises on behalf of PicturePro was very irregular and often not for months at a time.  *See* Hr'g Tr. 348:18–350:1 (June 12, 2020).  When asked why PicturePro even has a lease for the building at 900-902 Royal Street, Peter Hoffman explained:  "It has a lease to protect Susan . . . .  I'm going to do everything in my power to let her keep her home and if that requires some financial support from my company, then I am thrilled to give it."  Hr'g Tr. 266:8–13 (June 11, 2020).

### 2.   *The lease of 910-912 Royal Street, Unit C*

The property located at 910-912 Royal Street, Unit C is leased to RSB for the operation of the restaurant *Café Amelie*.  *See* AMAG Ex. 20.  The twenty-year lease between Royal Alice Properties, LLC and RSB is dated January 1, 2018, recorded in the Orleans Parish land records, and requires RSB to pay $10,000 per month, plus taxes, utilities, and homeowners' association fees.  *See id*.  As with the lease for the first floor of 900-902 Royal Street, although the Trust owns RSB, the Trust does not receive income from the operation of *Café Amelie*; rather the income generated from the operation of the restaurant is paid directly to Susan Hoffman and is reported on the joint income tax return of Peter and Susan Hoffman.  *See* Hr'g Tr. 187:18–190:4 (June 11, 2020).

### 3.   *The lease of 906 Royal Street, Unit E*

The Debtor leases 906 Royal Street, Unit E, to Leo Duvernay, LLC, for $600 per month; however, no executed, written lease exists.  *See* UST Ex. 16, at 33.  According to Susan and Peter Hoffman, Leo Duvernay, a member of Leo Duvernay, LLC ("Duvernay"), is a long-time friend

and contractor who has provided renovation services on the 900-902 Royal Street property since 1991.  *See* Hr'g Tr. 325:16–326:24 (June 12, 2020); UST Ex. 16, at 5.

### B. The Debtor's Creditors

Only two creditors have filed proofs of claim against the Debtor's estate.[4]  The first, AMAG, filed a proof of claim alleging a secured claim in the amount of $4,623,618.26, exclusive of post-petition interest, fees, and costs.  *See* Proof of Claim No. 2.  On September 23, 2019, the Debtor initiated an adversary proceeding challenging the amount owed to AMAG.  *See Royal Alice Properties, LLC v. AMAG, Inc*., Adv. No. 19-01133 (Bankr. E.D. La. filed Sept. 23, 2019).  On December 20, 2019, AMAG moved to terminate the automatic stay as to 900–902 Royal Street under 11 U.S.C. § 362(d)(4)(A), alleging that the transfer of the ownership of that property by Susan Hoffman to the Debtor on the eve of the Debtor's bankruptcy filing was made without AMAG's consent and as part of a scheme to "delay, hinder, or defraud" AMAG.  [ECF Doc. 78].

The second creditor, Arrowhead, filed a proof of claim for $1 million and also initiated an adversary proceeding, alleging in both that the Debtor is liable under alter-ego and/or single-business-enterprise theories, among others, for the unsatisfied obligations of several non-debtor affiliates of the Debtor against which Arrowhead has obtained money judgments.  *See Arrowhead Capital Fin., Ltd. v. Royal Alice Properties, LLC*, Adv. No. 20-01022 (Bankr. E.D. La. filed Apr. 13, 2020) (the "Arrowhead Adversary").[5]

---

[4]     The Bar Date for non-governmental entities to file proofs of claim against the Debtor's estate was December 2, 2019, and the Bar Date for governmental entities to file proofs of claim was February 26, 2020.  [ECF Doc. 63].

[5]     On March 5, 2020, the Debtor objected to Arrowhead's Proof of Claim No. 1 (the "Contested Matter").  [ECF Doc. 104].  Arrowhead filed a response to the Debtor's claim objection, [ECF Doc. 122], and the Debtor filed a Reply Brief, [ECF Doc. 124].  This Court held a hearing on the Contested Matter on April 8, 2020, allowed Arrowhead the opportunity to file a Sur-Reply, and took the matter under advisement.  [ECF Doc. 129].  On April 16, 2020, this Court issued an Order pursuant to Federal Rule of Civil Procedure 42 and Bankruptcy Rule 7042, consolidating the Contested Matter and the Arrowhead Adversary, finding that the transactions, facts, and circumstances underlying the Contested Matter arise

Because of the limited number of creditors in this case, no official committee of unsecured creditors has been appointed by the UST under § 1102 of the Bankruptcy Code.

### C.  The Debtor's Bankruptcy Filing and Post-Petition Activity

The Debtor filed its petition for chapter 11 bankruptcy relief on August 29, 2019. According to the Debtor, it "filed for relief under the Bankruptcy Code to stay an imminent foreclosure on its Real Estate Assets filed by AMAG." *See* Amended Disclosure Statement, at 10–11.  On February 5, 2020, the Debtor filed its first plan of reorganization and disclosure statement. [ECF Docs. 86 & 87].  Arrowhead, AMAG, and the UST filed objections. [ECF Docs. 109, 111 & 113].  On April 15, 2020, the UST filed its Motion To Convert, seeking (i) conversion of the case to one under chapter 7 pursuant to § 1112(b) of the Bankruptcy Code, or (ii) as an alternative, appointment of a chapter 11 trustee under § 1104(a).  [ECF Doc. 136].  The same day, Arrowhead filed its Ch. 11 Trustee Motion pursuant to § 1104(a).  [ECF Doc. 142].  Also on April 15, 2020, the Debtor filed the Amended Disclosure Statement and amended its plan of reorganization.  [ECF Docs. 146 & 147].

The Debtor's Amended Disclosure Statement indicates that the Debtor's plan of reorganization envisions refinancing the property located at 900–902 Royal Street to allow Susan Hoffman to retain her residence and selling the other two properties to pay in full the secured debt owed to AMAG.  *See* Amended Disclosure Statement, at 10–17.  The Debtor proposes to achieve those goals and fund the plan specifically by (i) obtaining bridge-financing to take out AMAG's first-position debt—or pay AMAG partially on its debt (depending upon the outcome of the

---

from the same common nucleus of operative fact and factually and legally overlap substantially, if not entirely, with the claims alleged in the Arrowhead Adversary.  [ECF Doc. 151].  The Debtor moved to dismiss the claims asserted in the Arrowhead Adversary pursuant to Federal Rule of Civil Procedure 12(b)(6).  [Adv. No. 20-1022, ECF Doc. 11].  On August 28, 2020, this Court granted in part and denied in part the Debtor's motion to dismiss.  [Adv. No. 20-1022, ECF Doc. 55].

adversary proceeding challenging the amount owed)[6] and subordinating AMAG's position to the bridge lender (a current requirement of the proposed bridge lender); (ii) selling two of its three properties, 910-912 Royal Street, Unit C (the site of *Café Amelie*) and 906 Royal Street, Unit E (the Duvernay space); (iii) servicing the bridge loan and paying the administrative expenses owed as of the Effective Date with rent proceeds; and (iv) refinancing the bridge loan within a year after the Effective Date to obtain more favorable terms. *See* Amended Disclosure Statement, at 24–25. The Debtor included an appraisal report as Exhibit B to the Amended Disclosure Statement, valuing (i) 900-902 Royal Street at $3,450,000; (ii) 910-912 Royal Street, Unit C, at $1,310,000; and (iii) 906 Royal Street, Unit E, at $200,000. *See* Amended Disclosure Statement, Ex. B.

Arrowhead, AMAG, and the UST each filed objections to the Amended Disclosure Statement, primarily on feasibility grounds, but also identifying concerns regarding third-party releases and the designation of Susan Hoffman as the authorized individual to investigate and prosecute retained causes of action against insiders. [ECF Docs. 159, 165 & 172]. Aside from the significant question of whether the bridge-financing or conventional financing proposals are "firm,"[7] the post-petition actions of the Debtor indicate that this Debtor cannot fund any plan that

---

[6] AMAG has asserted a claim against the estate in excess of $4.6 million. *See* Proof of Claim No. 2. The Debtor claims it only owes $580,000 to AMAG. [Adv. No. 19-1133, ECF Doc. 1].

[7] At this stage of the proceeding, no testimony or affidavits regarding the solidity of the proposed financing is in the record. But the term sheets attached to the Disclosure Statement are all unsigned, outdated, or expressly non-binding. *See* Amended Disclosure Statement, Exs. C & D. Peter Hoffman disclosed at the § 341 meeting of creditors that Royal Alice Properties, LLC's former lender, Whitney Bank, initiated foreclosure proceedings on certain Royal Street properties securing repayment of the loan while the Hoffmans were under federal criminal investigation. *See* UST Ex. 16, at 38–39. AMAG, whose principal had a business relationship with Peter Hoffman, made loans to the Hoffmans to pay off the Whitney debt and a separate judgment in August 2013. *Id.* Peter Hoffman disclosed that he intended to refinance the AMAG loan within the year to obtain more favorable terms, "[b]ut with the indictment and all the other madness, destruction of my company, we couldn't do that." *Id.* at 39. Peter and Susan Hoffman were convicted of federal mail and wire fraud in April 2015 and those convictions were affirmed on appeal. *See* Amended Disclosure Statement, at 18; *see also United States v. Hoffman*, 901 F.3d 523, 532 (5th Cir. 2018), *as revised*, (Aug. 28, 2008), *cert denied*, 139 S. Ct. 2615 (2019) (affirming Susan Hoffman's conviction and sentencing and affirming Peter Hoffman's convictions, but remanding for resentencing).

depends on rent proceeds.  To paraphrase the UST:  This Debtor is a landlord whose plan depends on collecting rent—and it hasn't collected the rent.  *See* Hr'g Tr. 8:3–9:12 (June 10, 2020).

All of the Debtor's leases have insiders as counterparties, except for perhaps the Duvernay lease—and in that instance, Duvernay is a close, long-time friend of Susan Hoffman who has not executed a written lease.  The 2018 lease originally between Susan Hoffman and PicturePro was amended on the Petition Date to substitute Royal Alice Properties, LLC, as the lessor after the Hoffmans transferred the 900-902 Royal Street property to the Debtor on the eve of bankruptcy, *see* UST Ex. 16, at 74–75—and that amendment afforded PicturePro more favorable terms.[8]  The record is unclear whether the rents charged in the leases reflect market values,[9] or whether Susan

---

Given that, and that the cloud over the transfer of 900-902 Royal Street from Susan Hoffman to the Debtor on the eve of bankruptcy remains unresolved, *see infra* note 8, the ability of the Hoffmans to secure non-usurious financing on behalf of the Debtor remains an open question.

[8]      In its motion to lift the automatic stay as to 900-902 Royal Street, AMAG has challenged that transfer of 900-902 Royal Street to the Debtor as contrary to the terms of the mortgage it holds on 900-902 Royal Street, stating that the transfer fraudulently moved that property out of AMAG's reach days before a scheduled state foreclosure sale.  In addition to acknowledging the transfer was made to stop the foreclosure sale, *see* Hr'g Tr. 193:12–25 (June 11, 2020), Peter Hoffman gave his own reasons for the transfer at the Debtor's § 341 meeting of creditors:

> There were essentially two compelling reasons why we needed to do it.  The first, as I was describing, that in order for any refinancing to be done, we had to eliminate any residential element to it so that we wouldn't be going into that box the banks have of residential loans.  And so we can't have, if you have a mixed property use, you won't get the loan.  It seems strange.  I didn't believe it at first.  But I assure you, having spent a year dealing with it, you've got to have it all, it needs to be under one roof all of the people said.  And the second thing about it is that if there's going to be any plan of reorganization, it's got to have all the property together to do it because it's all an integrated set of properties.  They're all physically contiguous.  They're all part of the Miltonberger Row.  You know, I don't know how you would do a plan without having all three properties put in. . . . And so in order to keep it clean and to make sure that we could have a proper resolution of these debts that are associated with the property, it was best to have it all in one place.

*See* UST Ex. 16, at 74–75.

[9]      According to Peter Hoffman, when asked how the Hoffmans determined that $10,000 per month reflected the market value for 910-912 Royal Street (*Café Amelie*), he replied:

> I think it would be fair to say that we are not taking the position that that is necessarily the fair market value of the premises. . . . That was set as a related party amount that reflected Susan's ongoing support of the business, and it also affects the profit-sharing with other

Hoffman consistently collected rent from RSB, Picture Pro, and Duvernay prepetition. Susan Hoffman testified that Royal Alice Properties, LLC, which held 910-912 Royal St., Unit C, and 906 Royal Street prior to its bankruptcy filing, never possessed its own bank account; rather, rents were deposited into her own personal bank account and commingled with her personal funds. *See* Hr'g Tr. 312:10–25 (June 12, 2020).[10] Susan Hoffman reported that the expenses on the building were such that the rents often did not cover the expenses. *See* Hr'g Tr. 313:1–314:6 (June 12, 2020).

What *is* clear is that Susan Hoffman, as the sole managing member of the Debtor, has never consistently collected rent from insiders post-petition, forcing the Debtor to operate in the red throughout this case. The Debtor filed its case on August 29, 2019. Under the leases and the oral agreement with Duvernay, the Debtor should have collected $25,600 in rent each month: (i) $10,000 from PicturePro, (ii) $10,000 from RSB for the operation of *Café Amelie*, (iii) $5,000 from RSB for the operation of *Petite Amelie*, and (iv) $600 from Duvernay. The monthly operating reports ("MORs") filed by the Debtor for September 2019 through January 2020 reported revenue

---

managers. And so it is not our position that those rentals are necessarily fair market rentals and may well have to be reset in the context of financing.

UST Ex. 16, at 64–65. To date, it does not appear that Susan Hoffman, as a fiduciary of the Debtor and its creditors, has made any attempt to reevaluate the amounts the Debtor charges for rent from insiders. In contrast, Scott Graf, the proposed real estate broker for the Debtor, testified that he based the proposed sale price of $2.5 million for 910-912 Royal Street, Unit C, on the assumption of a guaranteed $15,000 in monthly rent via a leaseback provision to any purchaser of the property. *See* Hr'g Tr. 400:14–402:19 (June 25, 2020).

[10]     As noted, Susan Hoffman transferred the property at 900-902 Royal Street to the Debtor days prior to the bankruptcy filing. *See* Hr'g Tr. 193:12-25 (June 11, 2020). Susan Hoffman testified that PicturePro paid prepetition rent to her "in one form or another," meaning "there were expenses that were incurred and, and sometimes we'd pay those expenses directly or Peter would pay them directly and like that." Hr'g Tr. 309:22–310:5 (June 12, 2020). When asked to identify those expenses, Ms. Hoffman stated, "some legal expenses." Hr'g Tr. 310:6–8 (June 12, 2020). Susan Hoffman also testified to her irregular bookkeeping and reconciliation of the amounts owed in rent and expenses paid by PicturePro, stating that she updated her records "from time to time when I needed to get a little idea of what was going on." Hr'g Tr. 310:9–311:4 (June 12, 2020).

and expenses of the Debtor on a cash basis, and show that the Debtor never collected more than

$15,000 in rent for those months.  *See* UST Exs. 2–7.[11]  The Debtor's amended May 2020 MOR

reported that PicturePro owed $80,000 in rent to the Debtor—it has only made one rent payment

since the Petition Date.  *See* Debtor Ex. D-1 (Rent Roll Schedule).  When asked if the Debtor had

sought to exercise its rights under the default provisions of the lease and terminate the lease with

PicturePro for non-payment of rent, Susan Hoffman answered "no . . . [b]ecause I understood that

Peter was offsetting this and he would, it was okay."  Hr'g Tr. 317:20–318:13 (June 12, 2020).

Essentially, the Debtor has collected significantly less than half of the total rent owed by its lessees

since the Petition Date.

In addition to the failure to collect and properly account for rent as an asset of the estate,

the Debtor has improperly set off post-petition rents for prepetition debts.  A review of the Debtor's

February 2020 MOR filed on April 29, 2020, reveals a line-item expense on the Profit and Loss

Statement for "Professional Fees" paid in September 2019, as well as a "Miscellaneous Expense"

of $15,600 paid in February 2020.  [ECF Doc 158, at 5].  No such expense for "Professional Fees"

had ever been listed on the Profit and Loss Statements in the September 2019 through January

2020 MORs.  [ECF Docs. 72, 83, 84, 90 & 130].[12]  And neither expense was recorded as a

disbursement on the Cash Summaries contained in any MORs reporting the finances of the Debtor

from September 2019 through February 2020, *see* ECF Docs. 72, 84, 90 & 130, but the October

2019 and February 2020 MORs each listed "Miscellaneous Expenses" of $10,000, *see* ECF Docs.

---

[11]    The January 2020 MOR shows that the Debtor collected $15,000 in September 2019, $11,200 in
October 2019, $10,000 in November 2019, $10,000 in December 2019, and $10,000 in January 2020.  *See*
UST Ex. 7 (Profit and Loss Statement).

[12]    Of note is also the fact that the Debtor consistently filed its MORs late.  It filed its October and
November 2019 MORs on January 15, 2020.  The Debtor filed the December 2019 MOR on February 13,
2020 and the January 2020 MOR on April 11, 2020.

83 & 158.  On the Cash Receipts and Disbursements Statements in the October 2019 and February

2020 MORs, the "Description (Purpose)" column for cash disbursements is notated:  "Payments

to professionals, owners, partners, shareholders, officers, directors or any insiders.  These amounts

are included in total cash disbursements above."  [ECF Docs. 83 & 158].

In its February 2020 MOR—for the first time—the Debtor recorded a "Due to Member"

line item in its liabilities identified on the Comparative Balance Sheet, identifying a debt owed by

the Debtor to its member, Susan Hoffman, in the amount of $25,687.00 as of September 30, 2019;

as of February 29, 2020, that debt had been reduced to $9,785.00.  [ECF Doc. 158, at 4].  The

Narrative contained in the February 2020 MOR stated:  "The MOR reflects accrual of both unpaid

rent related to 900 Royal St. both the commercial space ($5,000) and residential space ($10,000)

and also accrual of expenses payable (taxes, utilities, legal and advisory fees) which have been

paid by the lessees or Mrs. Hoffman."  [ECF Doc. 158, at 15].

The Debtor's March 2020 MOR, filed on May 6, 2020, added a spreadsheet entitled

"Details of A/R and Due to Member" and reflected a similar explanation in the Narrative:  "The

'Detail of A/R and Due to Member' reflects net accrued rentals from [PicturePro] less

administrative and other expenses accrued during the administration of this case and applied on

the Effective Date to approved claims."  [ECF Doc. 186, at 15].  The "Detail of A/R and Due to

Member" report documented post-petition rent credits given to PicturePro and *Petite Amelie* in

exchange for PicturePro's prepetition payments of $40,000 in fees to Pontchartrain Capital, LLC

and Bay Point Capital Partners II, LLC for services they performed in connection with seeking

refinancing options for Susan Hoffman and Royal Alice Properties, LLC, on the AMAG debt.  *See*

ECF Doc. 186, at 23; Hr'g Tr. 149:11–154:21 (June 11, 2020).  That report also identified rent

credits given to PicturePro and *Petite Amelie* for an insider's payment of the Debtor's pre- and

post-petition professional fees.  *See* ECF Doc. 186, at 23.  The Debtor gave all of these set-offs and rent credits without prior Court approval.

After the UST confronted the Debtor regarding its improper accounting practices, on June 8, 2020 (two days prior to the evidentiary hearing on the motions that are the subject of this Memorandum Opinion), the Debtor filed into the record amended MORs for every month of the Debtor's case to date.  [ECF Docs. 215–227]; *Amended Rent Roll Schedule for Monthly Operating Reports August 2019 Through May 31, 2020* (the "Amended Rent Roll"), [ECF Doc. 228]; *Signed Cover Sheet[s] for MOR[s]* for January 2020–May 2020, [ECF Docs. 229–233].  According to the testimony provided by Glyn Miller, Bankruptcy Auditor with the Office of the U.S. Trustee, the Debtor amended its MORs to report rental income—but not its expenses—on an accrual basis, instead of a cash basis; in other words, the Debtor reported accrued rental income that is owed whether it was actually received or not.  *See* Hr'g Tr. 26:13–27:22 (June 10, 2020).  When asked his opinion as to why a debtor would switch midstream from a cash-basis method of accounting to an accrual basis of accounting, Mr. Miller answered:  "In smaller companies, usually it's because they're not actually sometimes showing the picture they want to show.  In other words . . . if you just show the cash you receive and the cash you're paying out, it may not be reflective of the fact that things are either much better or much worse based on the accrual system."  Hr'g Tr. 55:25–56:5 (June 10, 2020).  Heading into the hearing on its Disclosure Statement, it is apparent that the Debtor desired to show that it was recording—if not actually collecting—all of the rent it was owed.  If the Debtor did not actually receive all of its rent payments, then that deficit should have been recorded as an account receivable on the Comparative Balance Sheet contained in the MOR, but the Debtor's MORs do not reflect such entries.  *See* Hr'g Tr. 28:9–15 (June 10, 2020) (testimony of Mr. Miller).  Instead, the lessees who did not pay rent in a given month were given

14

a credit for the rent against the amount "due to" the Debtor's sole member, Susan Hoffman. *See* Hr'g Tr. 30:18–37:20 (June 10, 2020) (analyzing Debtor's amended May 2020 MOR).[13]

According to the Debtor's amended May 2020 MOR, the total amount of unpaid rents owed to the Debtor since the Petition Date was $143,000. *See* ECF Doc. 227, at 22. That figure may or may not be correct, as that figure does not accord with the Amended Rent Roll filed contemporaneously with its amended May 2020 MOR on the docket. *See* ECF Doc. 228. The Amended Rent Roll schedule lists delinquent accounts receivable for rent at $100,000 for the life of this bankruptcy case to that point. *See id.* The $43,000 difference in the accounts receivable between the amended May 2020 MOR and the Amended Rent Roll is attributable to $40,000 in rent credited to RSB/*Petite Amelie* and $3000 in rent credited to Duvernay on the Amended Rent Roll. *Compare* [ECF Doc. 227], *with* [ECF Doc. 228]. Again, however, the Debtor did not actually receive $43,000 from RSB/*Petite Amelie* and Durvernay during the months between August 2019 and May 2020. A review of the Debtor's June 2020 MOR filed on July 29, 2020, reveals that the Debtor received cash receipts of $47,400—to Susan Hoffman's personal account, not the DIP Account—according to the following breakdown: (i) *Café Amelie* $30,000; (ii) PicturePro $10,000; (iii) *Petite Amelie* $5,000; and Duvernay $2,400. [ECF Doc. 295].

---

[13] As an example, in the Debtor's amended May 2020 MOR, the Cash Reconciliation summary page indicates that the Debtor actually received $10,000 in rent. *See* ECF Doc. 227, at 6. The Debtor is due to receive $25,600 per month in rent; in May 2020, that left a deficit of $15,600. The Comparative Balance Sheet in the amended May 2020 MOR shows that the accounts receivable due as of April 30, 2020 for PicturePro was $80,000 and that amount did not increase as of May 31, 2020, affirming the assumption that the $10,000 received by the Debtor came from PicturePro. *See* ECF Doc. 227, at 3. The accounts receivable due from RSB/*Café Amelie* as of April 30, 2020 was $10,000, and it increased to $20,000 as of May 31, 2020, indicating that RSB/*Café Amelie* did not pay its rent of $10,000 in May. *See id.* The accounts receivable due as of April 30, 2020 for RSB/*Petite Amelie* and Duvernay did not increase as of May 31, 2020, suggesting that those lessees paid rent, but the Cash Reconciliation summary indicates that the $5,600 due in rent from those entities for May 2020 was **not** received. Where is the $5600 tracked in the Debtor's MOR? The liability side of the Comparative Balance Sheet shows that the amount "due to member," that is, Susan Hoffman, decreased from $17,385 owed in April 2020 to $11,785 in May 2020—a difference of $5600. *See* ECF Doc. 227, at 4.

Whether one accepts the amended May 2020 MOR or the Amended Rent Roll, the Debtor's records show that, as of May 31, 2020, PicturePro owed $80,000 in post-petition rent to the Debtor. [ECF Docs. 227 & 228]. When asked at the evidentiary hearing on June 11, 2020, when the Debtor would collect the PicturePro receivable, Peter Hoffman testified that part of the account receivable would be paid, but that almost half would be disputed:

> Certainly, the [$]45,000 will be [paid] over the next 60 to 90 days. I think I have the money to do that, you know. There, there may well be—we're, we're considering with counsel whether or not we're entitled to object to part of that [$]80,000 with the proceeds, procedures of the bankruptcy court and it may be that we file something to be determined by the Court, with everybody being heard, as to what the amount of that is with nobody's rights being waived by anything that Susan or I do.

Hr'g Tr. 205:16–23 (June 11, 2020). His testimony is confusing in part because it is unclear which hat he was wearing when he testified—did he speak as the "authorized representative" of the Debtor or as a principal of PicturePro?

According to the Debtor's pro forma financial statement attached as Exhibit E to its Amended Disclosure Statement, prepared by Peter Hoffman and counsel, the Debtor must collect at least $15,000 per month to service its debt and fund the proposed plan. *See* Amended Disclosure Statement, Ex. E; Hr'g Tr. 162:23–163:13 (June 11, 2020). After the sale of 906 Royal Street, Unit E and 910-912 Royal Street, Unit C, as proposed by the Plan,[14] the Debtor's tenants would

---

[14] According to Peter Hoffman, 906 Royal Street, Unit E, would be sold to insider RSB, presumably to allow *Café Amelie* and *Petite Amelie* to maintain the properties' shared liquor license. According to the testimony provided by Peter Hoffman at the evidentiary hearing and at the Debtor's § 341 meeting of creditors, state licensing authorities allow RSB, which operates *Café Amelie* at 910-912 Royal Street, to use its liquor, business, and other licenses at that location for its operations at *Petite Amelie* on the first floor of 900-902 Royal Street because RSB controls the properties' shared courtyard; however, that arrangement is dependent on RSB or an affiliate also maintaining control of courtyard access through 906 Royal Street, Unit E. *See* Hr'g Tr. 169:11–170:2 (June 11, 2020); UST Ex. 16, at 33–35. According to Peter and Susan Hoffman, "it's necessary for the two retail spaces [*Café Amelie* and *Petite Amelie*] to be physically contiguous in order for the liquor license to apply, which was critical because it's very hard . . . to get a liquor license in the Quarter . . . . It's impossible." UST Ex. 16, at 34–35.

include only PicturePro and RSB/*Petite Amelie*—two insider lessees that have paid minimal rent post-petition, with PicturePro apparently planning to contest at least half of the amount it owes under its lease.

Aside from the uncertainty of the Debtor's proposed post-confirmation income stream, the pro forma financial statement has other issues as well.  As an analytical document that purportedly supports the Debtor's plan of reorganization, it fails to provide detailed projections on the application of sales proceeds of 906 Royal Street, Unit E, and 910-912 Royal Street, Unit C, to the AMAG secured debt or otherwise demonstrate whether AMAG will be paid in full or only partially paid.  *See* Amended Disclosure Statement, Ex. E.  It also fails to include known and foreseeable expenses, such as annual repair and maintenance costs for a 200-year-old building, payment of UST fees, administrative expense payments, or Class 2 debt (identified in the Amended Disclosure Statement and Plan as Arrowhead's claim and Duvernay's claim).  *See id.*; Hr'g Tr. 166:2–20 (June 11, 2020).

Without estimated costs for those expenses added, and assuming the full rent of $15,000 would be collected each month, the Debtor would only enjoy an approximate $630 cushion per month.  *See id.*; Hr'g Tr. 165:10–14 (June 11, 2020).  According to Peter Hoffman, he and Susan Hoffman will provide funding from their "substantial" personal income to pay "other expenses" of the Debtor, including costs for "unforeseen events."  Hr'g Tr. 165:17–166:1 (June 11, 2020).  That commitment, however, is not identified on the pro forma financial statement or elsewhere in the Amended Disclosure Statement or Plan.

17

## CONCLUSIONS OF LAW

### A. Cause Exists to Warrant the Appointment of a Trustee Under § 1104(a)(1)

The UST filed the Motion To Convert, seeking (i) conversion of the case to one under chapter 7 pursuant to § 1112(b) of the Bankruptcy Code, or (ii) as an alternative, appointment of a chapter 11 trustee under § 1104(a). Arrowhead also seeks appointment of a trustee pursuant to § 1104(a).

Section 1112 requires a bankruptcy court to convert a chapter 11 case to one under chapter 7 or dismiss it entirely, "whichever is in the best interests of creditors and the estate, for cause **unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate**." 11 U.S.C. § 1112(b)(1) (emphasis added). The Bankruptcy Code does not expressly define "cause" as it is used in § 1112(b)(1), but it does set forth a non-exhaustive list of examples of events that may constitute cause, including "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," "gross mismanagement of the estate," "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter," and "failure timely to provide information or attend meetings reasonably requested by the United States trustee." *Id*. § 1112(b)(4)(A), (B), (F) & (H).

Section 1104 of the Bankruptcy Code governs the appointment of a chapter 11 trustee and provides:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—
>
> > (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

>  (2) if such appointment is in the interests of creditors, any equity security
>  holders, and other interests of the estate, without regard to the number
>  of holders of securities of the debtor or the amount of assets or liabilities
>  of the debtor.

11 U.S.C. § 1104(a).  "The appointment of a Trustee in a Chapter 11 case is an extraordinary remedy which should not be granted lightly, as it may impose a substantial financial burden on a hard-pressed debtor seeking relief under the Bankruptcy Code."  *In re Sharon Steel Corp.*, 86 B.R. 455, 457 (Bankr. W.D. Pa. 1988), *aff'd*, 871 F.2d 1217 (3d Cir. 1989) (citations omitted).  "The movant must prove the need for a trustee by clear and convincing evidence."  *In re Euro-Am. Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007) (citing *In re Sharon Steel Corp.*, 871 F.2d at 1225).

Section 1104(a)(1) provides several examples of "cause" in considering whether the appointment of a trustee is required, including "gross mismanagement of the affairs of the debtor." "The language of § 1104(a)(1) of the Code represents Congressional recognition that some degree of mismanagement exists in virtually every insolvency case."  *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (citations omitted).  "While a certain amount of mismanagement of the debtor's affairs prior to the filing date may not be sufficient grounds for the appointment of a trustee, continuing mismanagement of the affairs of a debtor after the filing date is evidence of the need for the appointment of a trustee."  *Id.* (citations omitted).  "The various factors used to determine whether current management is guilty of gross mismanagement and incompetence will vary depending on the facts of the individual case."  *In re Sharon Steel Corp.*, 86 B.R. at 458.

This Court declines at this time to convert this case to one under chapter 7 for cause.  The Debtor holds valuable assets and has a viable business model and this Court believes that creditors would not be served by a liquidation.  But the record in this case amply supports the appointment

of a chapter 11 trustee under § 1104(a)(1).  "A chapter 11 debtor and its managers owed fiduciary duties to the estate."  *In re Euro-Am. Lodging Corp.*, 365 B.R. at 428 (citation omitted).  "A debtor-in-possession has all of the duties of a trustee in a Chapter 11 case, including the duty to protect and conserve property in its possession for the benefit of the creditors."  *In re Cajun Elec. Power Co-op, Inc.*, 191 B.R. 659, 661 (M.D. La. 1995), *aff'd*, 74 F.3d 599 (5th Cir. 1996).  Indeed, "[t]here is no more fundamental duty of a debtor in possession to the estate than to ensure prepetition creditors are not paid absent court authority."  *In re Texasoil Enters., Inc.*, 296 B.R. 431, 437 (Bankr. N.D. Tex. 2003) (citing *In re CoServ, L.L.C.*, 273 B.R. 487, 494 (Bankr. N.D. Tex. 2002); *Chiasson v. J. Louis Matherne & Assoc. (In re Oxford Mgmt.)*, 4 F.3d 1329, 1335 (5th Cir. 1993)).

The record shows that the Hoffmans have continued to operate the Debtor for their own benefit, rather than that of the creditors in this case.  Susan Hoffman is the sole member and manager of the Debtor, but her testimony demonstrated to this Court that she is ill-equipped to manage the Debtor's affairs, and defers considerably, if not entirely, to Peter Hoffman's decisions. This Debtor has a focused business model:  it owns property and leases that property to generate income.  But Susan Hoffman did not consistently collect rent owed to the Debtor post-petition. Instead, the Hoffmans caused the Debtor to give post-petition set-offs and rent credits to its insider lessees, PicturePro and RSB, for payment of prepetition expenses associated with the refinancing efforts of the AMAG debt belonging to Susan Hoffman and Royal Alice Properties, LLC, and some post-petition professional fees.  Then the Debtor submitted MORs that lacked transparency and were misleading in order to present a rosier outlook on the Debtor's income.

Peter Hoffman testified that he did not understand the disclosure requirements in bankruptcy but that, although he believed "that [he] was entitled to have credit for expenses

PicturePro paid related to the financing in this proceeding[,] . . . we're ready to accept [creditors']
and the U.S. Trustee's view that all those payments will just have to be borne by PicturePro and
it's still got to pay its rent." Hr'g Tr. 220:21–23; 221:8–10 (June 11, 2020). The Court did not
find credible Peter Hoffman's testimony that he did not understand the Debtor's reporting
requirements—or that he did not know the Debtor cannot pay its prepetition debts without Court
approval. Peter Hoffman is not unsophisticated; he is an attorney, albeit an attorney with a
suspended license, and he has operated several companies over the course of his career. He
attended the Initial Debtor Interview with the UST's office, *see* Hr'g Tr. 195:3–5 (June 11, 2020),
and he and Susan Hoffman, on behalf of the Debtor, have had the benefit of bankruptcy counsel.

In addition to setting off prepetition expenses through rent credits to insiders without Court
authorization, Susan Hoffman continued to deposit the rent that was actually collected into her
personal account instead of conducting operations of the Debtor through the DIP account as
required by the UST. In sum, the Hoffmans ran the Debtor's business the same way in which they
had conducted business prior to filing for bankruptcy relief. The Debtor has enjoyed bankruptcy
protections since September 2019, but the Debtor's principals have not committed to fulfilling
their fiduciary duties to the estate. As a result, the Debtor has never been able to maintain adequate
cash flow to cover either its current expenses or its contemplated plan expenses. The impact on
the estate as a result of the Debtor's principals' continued failure to perform their duties under the
Bankruptcy Code is sufficient cause for the appointment of a trustee under § 1104(a)(1).

## B. Appointment of a Trustee Is in the Best Interests of Creditors and the Estate Pursuant to § 1104(a)(2)

Section 1104(a)(2) "creates a flexible standard and allows the appointment of a trustee even
when no 'cause' exists." *In re Ionosphere Clubs, Inc.*, 113 B.R. at 426 (citing *In re Sharon Steel
Corp.*, 871 F.2d at 1226); *see also In re Cajun Elec. Power Co-op, Inc.*, at 661. The bankruptcy

court has broad discretion to appoint a trustee under § 1102(a)(2). *See In re Sharon Steel Corp.*, 871 F.2d at 1226; *In re Euro-Am. Lodging Corp.*, 365 B.R. at 428; *In re Evans*, 48 B.R. 46, 48 (Bankr. W.D. Tex. 1985). Indeed, "[u]nder 11 U.S.C. § 1104(a)(2), the Court may utilize its broad equity powers to engage in a cost-benefit analysis in order to determine whether the appointment of a Trustee would be in the interests of creditors, equity security holders, and other interests of the estate." *In re Sharon Steel Corp.*, 86 B.R. at 457 (citation omitted). "Consequently, the analysis becomes one of whether the cost of appointing a Trustee is outweighed by the benefits derived by the appointment." *Id.*

"In general, the factors which have been the basis for appointing a trustee under § 1104(a)(2) are diverse and in essence reflect the practical reality that a trustee is needed." *Id.* (citations omitted). "Among the factors considered are: (i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment." *In re Ionosphere Clubs, Inc.*, 113 B.R. at 168 (internal citations omitted); *see also In re Cajun Elec. Power Co-op, Inc.*, 191 B.R. at 661–62.

Applying those factors to the case at bar, the Court concludes that the appointment of a trustee is in the best interest of the estate. The trustworthiness of this Debtor to protect the interests of the estate has been cast in doubt due to the Debtor's willingness, absent Court approval, to set off prepetition expenses with the post-petition rents that were due to the Debtor and then obfuscate those set-offs by filing opaque MORs. Those set-offs did not benefit the Debtor, only insiders of the Debtor. Further, there is little evidence in the record that the Debtor is capable of a successful reorganization, first and foremost because of its unwillingness to collect rents, its primary source

of income, but also because non-usurious financing may simply not be available to the Hoffmans. Underlying the lack of trustworthiness of this Debtor, its inability to reorganize, and the fact that the Debtor's two creditors and the UST—the only parties in interest to this case—have no confidence in the Debtor's current management is this: the Debtor and its lessees are insider affiliates and the Debtor is operated for the benefit of those insiders.

"Where [the managers of the Debtor] suffer from material conflicts of interest, an independent trustee should be appointed under § 1104(a)(2)." *In re Euro-Am. Lodging Corp.*, 365 B.R. at 428 (collecting cases). "A conflict of interest can arise where a debtor has multiple roles that give rise to conflicting duties and obligations." *In re Taub*, 427 B.R. 208, 227 (Bankr. E.D.N.Y. 2010) (citing *In re SunCruz Casinos, LLC*, 298 B.R. 821, 831 (Bankr. S.D. Fla. 2003)). The Debtor's stated objective entering bankruptcy was to refinance the debt owed to AMAG to allow Susan Hoffman to maintain her residence at 900-902 Royal Street. The Debtor's grant of post-petition rent credits and other set-offs for prepetition expenses only benefitted PicturePro, RSB, and Susan Hoffman—all insiders—and were not actions taken in the best interest of the estate or its creditors. And Susan Hoffman continues to occupy the most valuable asset of the Debtor herself, rent free. Susan Hoffman, as the sole member/manager of the Debtor, has a fiduciary duty to enforce the terms of the Debtor's leases, as well as to investigate prepetition fraudulent transfers, but it is highly unlikely that she will do so. At every turn, a Hoffman or a Hoffman affiliate is on both sides to each contract in this case. The Debtor, PicturePro, and RSB are all under common control.

The principals of the Debtor suffer from myriad conflicts which interfere in their ability to operate the Debtor for the benefit of the estate and its creditors. The Court finds that, based on the totality of the circumstances here, the protection and potential recovery for the estate through

appointment of a trustee far outweighs the cost of the services to be rendered. The creditors in this case are few and the assets, while few, have considerable value. An independent and neutral trustee, who owes fiduciary duties to both the Debtor and all creditors, will be able to get up to speed quickly and operate the Debtor's business, as well as investigate causes of action belonging to the Debtor, without the conflicts currently afflicting the Debtor's management. An independent and neutral trustee will be able to negotiate with creditors objectively and provide transparency and reliability to creditors, the UST, and this Court regarding the finances of the Debtor. And an independent and neutral trustee will be able to take over the rehabilitation effort and supervise the Debtor's reorganization to maximize distributions to creditors from the estate. This Court, therefore, appoints a trustee in this case pursuant to § 1104(a)(2).

Based on the foregoing findings of fact and conclusions of law, this Court

(**1**) GRANTS IN PART and DENIES IN PART the *United States Trustee's Motion To Convert Case to Chapter 7 or, in the Alternative, Appoint a Chapter 11 Trustee*, [ECF Docs. 136 & 201], and orders the United States Trustee to appoint a chapter 11 trustee in this case;

(**2**) GRANTS the *Motion of Party in Interest Arrowhead Capital Finance, Ltd. for Appointment of a Trustee for Debtor's Estate*, [ECF Doc. 142];

(**3**) DENIES WITHOUT PREJUDICE the Debtor's *Motion for Entry of Order Authorizing Debtor To Obtain Postpetition Financing*, [ECF Doc. 143];

(**4**) DISAPPROVES WITHOUT PREJUDICE the Debtor's *Disclosure Statement for Amended Plan Dated April 15, 2020*, [ECF Doc. 147];

(**5**) DENIES WITHOUT PREJUDICE the Debtor's *Application Authorizing Employment of Scott Graf and Corporate Realty Leasing Company, Inc. as Real Estate Broker*, [ECF Doc. 140]; and

(**6**) DENIES WITHOUT PREJUDICE the Debtor's *Motion for Entry of an Order Deeming Debtor's Amended Petition Designating Itself as a Subchapter V Small Business Debtor Choosing To Proceed Under Subchapter V of Chapter 11 as Correct or, Alternatively, Dismissing Case for Purposes of Refiling Under Subchapter V*, [ECF Doc. 192].

An Order for appointment of a chapter 11 trustee pursuant to § 1104 of the Bankruptcy Court will be entered separately into the record.

New Orleans, Louisiana, September 4, 2020.

MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE